# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 17, 2013

## STATE OF TENNESSEE v. LESERGIO D. WILSON

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-1912      Cheryl A. Blackburn, Judge**

---

**No. M2012-00500-CCA-R3-CD - Filed June 18, 2013**

---

The defendant, Lesergio D. Wilson, appeals his Davidson County Criminal Court convictions of felony murder and especially aggravated robbery, claiming that the trial court erred by denying his motions to suppress both the statement he made to police and the evidence seized in his traffic stop, that the evidence was insufficient to support his convictions, and that the trial court erred by ordering consecutive service of his sentences. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Jeffrey A. DeVasher (on appeal); and Gary Tamkin and Mary Kathryn Harcombe (at trial), Nashville, Tennessee, for the appellant, Lesergio D. Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Tom Thurman and Bret Gunn, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions relate to the robbery and shooting death of the victim, Usama Shehata. At trial, the victim's wife, Mariam Zaky, testified that she and her husband were Egyptian immigrants and that the victim had been in the United States for one year prior to his murder. Ms. Zaky stated that her husband carried a wallet that typically contained two to three hundred dollars in cash, in addition to his green card, his social security card, papers, and photographs. The victim also carried his car keys and his cellular telephone with him.

Magdy Daniel testified that he owned and operated the Smoke Depot on Porter Road, a tobacco store. Mr. Daniel testified that the victim had only worked for him for seven days at the time of his murder. Mr. Daniel explained that, on the day of the murder, April 7, 2010, he had worked the morning shift at the store, and the victim worked the second shift alone. The victim was to close the store at 10:00 p.m. Mr. Daniel had three security cameras inside his store, and one of those cameras recorded sound. The time-stamp on the surveillance footage showed the victim leaving the store through the front door at approximately 9:58 p.m., although the State argued in closing argument, without objection, that the time-stamp was approximately 13 minutes slow. Although the parking lot is not visible on the video, a short "bang" can be heard at 9:58:38, followed by a second "bang" at 9:58:46.

Ajeel Mohammad testified that he operated a cellular telephone store that was located in the same building as and next door to the Smoke Depot. Mr. Mohammad stated that he had a security camera outside his store which also showed the front door of the Smoke Depot. Mr. Mohammad acknowledged that the time-stamp on the surveillance camera was close to one hour slow. According to Mr. Mohammad's video, at 8:56:50 on April 7, a person approached the front door of the Smoke Depot and then walked away. The video then shows the victim leaving the Smoke Depot at 9:10:20.

Danielle Howse testified that, at approximately 10:30 p.m. on April 7, she was driving her vehicle on Porter Road when she noticed a man on his knees next to a vehicle; the man's head was down, and he was motionless. Ms. Howse noticed blood on the man's shirt and pants. She called out to him from her vehicle, but she got no response. She then turned into the parking lot, and her vehicle's headlights revealed blood coming from the man's head. When she again got no response from the man, Ms. Howse called 9-1-1. Ms. Howse observed what appeared to be "a lunch bag and a bottle of water" resting on the back of the vehicle. Ms. Howse recognized the victim as an employee of the Smoke Depot, which she had patronized on previous occasions.

Officer Frederick Nelson with the Metro Nashville Police Department ("Metro") testified that, at 10:38 p.m. on April 7, he responded to a call about a shooting at Porter Road and Greenwood Avenue. When Officer Nelson arrived on the scene, he found the victim lying on the ground next to the vehicle. Officer Nelson interviewed Ms. Howse and established a perimeter.

Metro Detective Matthew Filter responded to the crime scene on April 7 and searched the victim to determine his identity. Detective Filter testified that the victim had no identification and nothing in his pockets when he was discovered. The police determined his identity after checking the registration of the vehicle next to the victim. Law enforcement

officers later contacted the owner of the Smoke Depot and the victim's wife, who positively identified him. Detective Filter stated that no fingerprint or deoxyribonucleic acid ("DNA") evidence linked the defendant to the crime. Detective Filter stated that he searched the railroad tracks in an attempt to locate the personal items allegedly discarded by the defendant, but he was unable to locate any of those items.

Doctor Tom Deering, a medical examiner, testified that he performed an autopsy on the victim. During the course of the autopsy, Doctor Deering recovered a bullet from the victim's back. Doctor Deering determined that the bullet entered the victim's head above his left ear, traveled through the victim's brain, and came to rest above and near his right shoulder blade. Doctor Deering was able to determine that the gun was between six and 24 inches from the victim's head when it was fired, based on the gun powder stippling on the victim's head. Doctor Deering testified that the cause of the victim's death was a single gunshot wound to the head and that the manner of death was homicide.

Metro Detective Curtis Hafley testified that on April 16, 2010, he arranged the defendant's arrest on an outstanding misdemeanor warrant.[1] Detective Hafley had previously met with Metro patrol officers, showing them photographs of the defendant and informing them of the warrant. While in an unmarked vehicle and street clothing, Detective Hafley located the defendant at the Panorama Apartments, where the defendant's girlfriend allegedly resided:

> I then parked – I saw [the defendant] walking down from the apartment building. He got in the passenger's side of his car. It was daylight, sunshine, clear view of him, just the opposite side of the parking lot, not very far away. I recognized him immediately. I got on the radio, told the other police cars that I had met with about looking for [the defendant] and where he was, what he was wearing, what car he was in, and where he was sitting. And they drove out of the – the vehicle drove out of the apartment complex. I followed them. I saw the police cars pull in behind him to pull him over, and I continued on.
>
> . . . .

---

[1]Although it was unknown to the jury, Detective Hafley was also investigating the defendant on an unrelated murder charge. The defendant was eventually charged with first degree murder in this separate incident as well. The outstanding warrant, apparently unrelated to either case, was described by Detective Hafley as involving either a "domestic violence" case or a "simple assault" case.

> . . . . I turned around and drove back by and saw that they had located him and that they were serving the warrant. But I did not stop, I did not talk to anybody.

Approximately two weeks later, Detective Hafley contacted the defendant by telephone to arrange a meeting, explaining to the defendant that he needed to discuss an ongoing investigation with him. On May 1, Detective Hafley and Detective Mark Woodfin met the defendant in a restaurant parking lot. During their interview with the defendant, the defendant indicated that he typically resided with his grandmother at 66 Creighton Avenue. Detective Hafley identified the Creighton Avenue address and the Panorama Apartments on a map of East Nashville, both of which are within a few blocks of the crime scene. The defendant told Detective Hafley that the gun recovered from the car during his arrest on April 16 was not his. He claimed that, when exiting the apartment complex, he found the gun in a discarded bag next to his car.

On May 21, 2010, Detective Hafley conducted a second interview with the defendant, this time at the police precinct. The defendant was not wearing a shirt when he was brought in for the interview. During the interview, Detective Hafley asked the defendant if he was under the influence of any drugs or alcohol, and the defendant stated that he had consumed approximately half of a half-pint of brandy just prior to his arrest. He also stated that he was "getting cold" because he was not wearing a shirt, but he then stated that he was fine. The defendant, who was 23 years of age at the time, signed a waiver of his constitutional rights after being provided *Miranda* warnings. Although he initially maintained that he found the .357 handgun in a bag by his car at the Panorama Apartments, he eventually admitted that he got the gun "from out South." When confronted about the victim's murder, the defendant stated that he knew nothing about it, but when the detectives told him that the gun matched the bullet found in the victim, the defendant stated that he robbed the victim.

The defendant told them that when the victim exited the Smoke Depot and walked to his car, the defendant told him to "give me everything in your pockets. He gave me everything, put everything on the car. So I mean he was cooperative so I just took everything." The defendant stated that the victim put everything on the back of the trunk. After robbing the victim, the defendant stated that he turned and fled down the railroad tracks. He turned back when the heard the victim yell and believed that the victim was pointing something at him, which prompted the defendant to fire two gunshots at the victim. The defendant told the officers that the victim's wallet contained $200 "and a whole bunch of pictures and papers and stuff like that." The defendant then claimed that he discarded the wallet on the train tracks. He also stated that he stole the victim's cellular telephone and car keys. The defendant eventually changed his story and indicated that, while standing by the

-4-

trunk of the car, he shot the victim in the head. After the detectives pressed him about an accomplice, the defendant again changed his story and indicated that a man named Trevon assisted him in the crime and was the actual shooter. Law enforcement officers never found anyone named Trevon matching the description given by the defendant.

Metro Officer Marty Reed testified that, on April 16, 2010, Detective Hafley requested that he stop a car in which the defendant was a passenger to issue an outstanding misdemeanor warrant. When Officer Reed stopped the car, which was driven by the defendant's girlfriend, Alicia Nicole Williams, he noticed the defendant "leaning down in the front like towards the floorboard of the car." Officer Reed had previously identified the defendant from a mug shot and recognized him as the person named in the warrant. When Officer Reed directed the defendant to step out of the vehicle and place his hands behind his back, the defendant began to struggle. Officer Reed stated that he needed the aid of two additional officers to handcuff the defendant. After placing the defendant under arrest, Officer Reed noticed "in the front floorboard . . . sticking out underneath the seat . . . a handle to a pistol and a cylinder, which would be a revolver." Officer Reed stated that the revolver had six rounds in the cylinder at the time he recovered it from the vehicle. When Officer Reed asked the defendant how the gun came into his possession, the defendant responded, "[P]eople drive my car."

Marcus Akins testified that, at his cousin's funeral, he met the defendant, who was introduced to him as his cousin's best friend. Sometime after meeting the defendant, Mr. Akins learned of the victim's murder on the news. In May, 2010, Mr. Akins encountered the defendant at the home of a mutual friend by the name of Torian Williams. Mr. Akins overheard the defendant's telling Mr. Williams that the defendant had killed someone. Later, the three men were standing outside together, and the defendant again stated that he had "just killed somebody" and that he "had did [sic] something at the store on Porter Road." Mr. Akins told the defendant that he had seen, on the local news, surveillance camera footage of someone trying to open the door of the Smoke Depot and asked whether that was the defendant. The defendant responded that it was he.

Special Agent Shelly Betts with the Tennessee Bureau of Investigation ("TBI") crime laboratory testified that she examined the bullet recovered from the victim's body and stated that it was a .38 or .357 caliber hollow point bullet. She confirmed that the ammunition recovered with the .357 handgun were also hollow point bullets. After examining the .357 revolver recovered from the defendant, Special Agent Betts determined that the bullet recovered from the victim's body had been fired from the defendant's gun.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v.*

*State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify.

Based on this evidence, the jury convicted the defendant as charged of felony murder and especially aggravated robbery. The trial court imposed an automatic sentence of life imprisonment for the murder conviction. Following a sentencing hearing, the trial court sentenced the defendant to 25 years for especially aggravated robbery and ordered that sentence to be served consecutively to the defendant's life sentence, for an effective sentence of life plus 25 years.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the incriminating statements he provided to law enforcement officers, that the trial court erred by denying the defendant's motion to suppress the revolver seized at the traffic stop, that the evidence adduced at trial was insufficient to support his convictions, and that the trial court erred by ordering consecutive sentencing. We consider each claim in turn.

## *I. Motion to Suppress Statement*

The defendant contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to police, claiming that the statements were obtained in violation of his constitutional rights. Specifically, the defendant claims that, during his May 21 interview, he was intoxicated and that, therefore, his statements "were not the product of a free mind and rational intellect." In addition, the defendant contends that his statement was involuntary because law enforcement officers obtained it through promises of leniency. The State asserts that the trial court did not err by denying the motion and admitting the statements as evidence at the defendant's trial.

At the hearing on the defendant's motion to suppress his pretrial statement, Detective Hafley testified that the defendant was "very clear, lucid" and that by the defendant's own description, he had only consumed "maybe the top fourth out of a half pint bottle" of brandy prior to his arrest. On cross-examination, Detective Hafley admitted that he told the defendant that he was facing "two Ls," meaning two life sentences, for both the murder of the victim and the other first-degree murder charge the defendant was facing. Detective Hafley also admitted that he referenced Gaile Owens, a Tennessee death row inmate, who, according to Detective Hafley, received the death penalty "because she didn't talk and her co-defendant did." Detective Hafley stated, however, that he "made it clear to [the defendant] that [he] did not make those decisions, [he] was not promising him anything, [he] was not threatening him with anything," and that he was just providing the defendant with "all the information so he could make his decision."

The trial court, in a comprehensive and well-reasoned order, denied the defendant's motion to suppress, concluding that the defendant's waiver of his rights "was knowing, intelligent, and voluntary, and that his statements to police were not coerced." The trial court specifically found that the recording of the defendant's interview revealed that he knowingly waived his constitutional rights and that he "was not so intoxicated that he could not understand his rights." With respect to the defendant's claims of police coercion, the trial court found that, although "a close case," the comments of law enforcement officers about "potential punishment and the potential effects of [the defendant's] willingness or refusal to tell the truth about these cases did not amount to coercive behavior that rendered the Defendant's statements involuntary."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[2]

Upon our review, we conclude that the record supports the trial court's conclusions that the defendant's statements were voluntarily given and were not the result of police coercion or promises of leniency. The 23-year-old defendant was provided with *Miranda* warnings on May 21, and he signed a waiver of his rights. The defendant did ask Detective Hafley what it meant to "waive his rights." After Detective Hafley gave an explanation, the defendant indicated his understanding and signed the waiver. The trial court accredited Detective Hafley's testimony that the defendant was not intoxicated at the time of the interview and found that the video recording of the interrogation supported Detective Hafley's testimony in that regard. At the outset of the interview, the defendant denied being drunk or high, and by his own admission, he had consumed only half of a half-pint of brandy at the time of his arrest. The trial court also found – and the record supports the finding – that the defendant "was not negatively affected by the interview room temperature."

Moreover, the statements made by law enforcement officers regarding potential sentences did not amount to promises or police coercion. On appeal, the defendant relies on the following statements of Detective Hafley to the defendant in support of his claim that the defendant's confession was the result of promised leniency and implicit threats of the death penalty:

> You're twenty-three so you're talking fifty-one years, you're going to be seventy-four years old before you are even eligible to get out. The only way, the only way in a situation like this for you to help yourself is to tell the truth. And let me tell you a little story, okay? There's a lady from Memphis who is at the Women's Prison up here off of Briley Parkway . . . .
>
> . . . .

---

[2]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

> She's on Death Row right now, the woman is. Because she wanted her husband killed and she had him killed. She didn't physically do anything. She didn't pull the trigger, she didn't do anything other than set it up and have it done. And the person who did it got caught and the person who did it talked. The person who did it did not get the same which she got. . . .

The detective, however, cautioned the defendant that he "can't promise you that you're gonna get out of this scot free" and that "it will be the [District] attorney's that will be prosecuting you and telling the jury how awful you were." When looking at the totality of the circumstances and, as the trial court stated, taking Detective Hafley's comments "as a whole," it is clear that the detective's statements could not be considered coercive or enforceable promises of leniency.

The trial court did not err by denying the defendant's motion to suppress his statements.

## II. Motion to Suppress Evidence

The defendant next contends that the trial court erred by denying his motion to suppress the handgun seized as a result of the defendant's traffic stop. The defendant argues that Officer Reed lacked probable cause to stop his vehicle and thus, that the handgun should have been suppressed as "the fruit of an illegal stop and seizure." We disagree.

At the suppression hearing, Detective Hafley testified that he was the lead investigator in the homicide of David Hurst and that the defendant's "name had come up" as a potential suspect in that investigation. Detective Hafley discovered that the defendant had an outstanding arrest warrant for either "domestic violence" or "simple assault," and he notified Metro patrol officers of the existence of the warrant and distributed photographs of the defendant to the officers. On April 16, 2010, Detective Hafley located the defendant exiting the Panorama Apartments. Detective Hafley immediately recognized the defendant and watched him get into the passenger side of a vehicle he believed to be a Dodge Diplomat. When the driver of the vehicle left the parking lot, Detective Hafley radioed uniformed patrol officers and informed them that he had located the defendant. He asked the officers to stop the vehicle and arrest the defendant on the outstanding warrant. Detective Hafley was following Officer Reed's patrol car when Officer Reed stopped the defendant's vehicle. At that point, Detective Hafley drove past the scene and did not witness the defendant's arrest.

Officer Reed testified that he was on patrol April 16 when Detective Hafley radioed the location of the defendant, along with a description of the defendant and his

vehicle, and indicated that he was following him in an unmarked car. Officer Reed was aware that the defendant had an outstanding warrant, and he testified that Detective Hafley told him that the warrant had been verified. After stopping the defendant's vehicle and asking the defendant to step out of the car, Officer Reed noticed the handgun protruding from under the passenger seat of the vehicle.

Unquestionably, the defendant was seized at the time Officer Reed pulled behind his vehicle and activated the cruiser's blue lights. *See State v. Williams*, 185 S.W.3d 311, 318 (Tenn. 2006). The defendant's reliance, however, on case law involving warrantless seizures is irrelevant because the arrest in this case was made pursuant to a valid warrant. *See* T.C.A. § 40-7-101 (providing that an arrest may be made by "[a]n officer under a warrant").

The defendant advances the theory that Officer Reed lacked probable cause to arrest him because the arrest was made at the direction of Detective Hafley without any independent verification on Officer's Reed part and that, therefore, the arrest was based on unconfirmed hearsay. We believe, as did the trial court, that the defendant's reliance on this theory is misplaced. In yet another thorough and well-reasoned order, the trial court made the following findings:

> [T]he Defendant's seizure and subsequent arrest were not rendered unlawful by Officer Reed's personal failure to confirm that the Defendant had a warrant for his arrest before pulling over the Defendant's car. Tennessee, like other jurisdictions, has adopted the "police team" or "fellow officer" rule, which "provides that 'an act taking place within the view of one officer [is] in legal effect within the [presence and] view of the other cooperating officers.'" *State v. Ash*, 12 S.W.3d 800, 805-06 (Tenn. Crim. App. 1999). The prevailing case law in Tennessee and other jurisdictions generally applies this principle to uphold arrests in situations where one officer observes a suspect committing an offense (thus justifying a warrantless arrest) and requests assistance via police radio or other reliable communication, while a second officer arrests the suspect. *See, e.g., State v. Bryant*, 678 S.W.2d 480 (Tenn. Crim. App. 1984) (affirming arrest where first officer observed suspect speeding; second officer who heard radio broadcast for assistance but did not see driver arrested driver); *State v. Maxie Lewis Hunter*, No. 89-101-III (Tenn. Crim. App. Oct. 13, 1989) (affirming arrest where deputy sheriff observed suspect driving while intoxicated;

second officer heard dispatch and spoke to deputy before arresting suspect, whom arresting officer did not see driving). The instant case admittedly differs from those cited above in that Detective Hafley did not observe the Defendant commit an offense before calling for assistance. However, before putting out the call for assistance Detective Hafley confirmed that Defendant had an active arrest warrant against him and positively identified the Defendant while conducting surveillance at the Porter Road apartment. The Defendant's outstanding arrest warrant gave Detective Hafley the authority to arrest the Defendant. *See* Tenn. Code Ann. § 40-7-101 (2006). Given this fact, and the Rule of Criminal Procedure which states that an officer need not have an arrest warrant in his possession at the time of arrest, *see* Tenn. R. Crim. P. 4(e)(3), the Court sees no reason why the "police team" approach, in which the arrest power of an officer who sees a suspect commit an offense in his presence is imputed to other officers, cannot apply to situations in which the initial officer's authority to arrest is based upon an outstanding warrant.

After Detective Hafley confirmed the existence of the arrest warrant and positively identified the Defendant as the passenger in the Dodge, Officer Reed heard Detective Hafley state that the passenger in the vehicle he was following had an outstanding arrest warrant, and Officer Reed also saw Detective Hafley's car following the Defendant's vehicle. Under the facts of this case, the Court concludes that Officer Reed had the authority to arrest the Defendant pursuant to the outstanding warrant; at the very least, Officer Reed had the reasonable suspicion necessary to stop the Defendant's vehicle and confirm that the Defendant did in fact have a warrant against him. *See State v. Yeargan*, 958 S.W.2d 626, 631-33 (Tenn. 1997) (officer who arrested suspect for driving on revoked license had reasonable suspicion to stop suspect's car when officer had been in court when suspect previously convicted of DUI and had license revoked; fact that arresting officer did not confirm license revocation before stopping suspect did not render stop unconstitutional). In either respect, the stop of the Defendant's vehicle was not unreasonable and did not violate the Defendant's constitutional protection against unreasonable

seizure.

We find the trial court's reasoning sound. The fact that Detective Hafley communicated the information regarding the warrant and the accompanying description of the defendant and his vehicle to Officer Reed did not somehow mysteriously convert the warranted arrest into a warrantless arrest. As such, we find no error in the trial court's denial of the defendant's motion to suppress the evidence seized as a result of his arrest.

### III. Sufficiency of the Evidence

Next, the defendant argues that the evidence is insufficient to support his convictions of felony murder and especially aggravated robbery because, independently of the defendant's confession, insufficient corroborating evidence exists to link the defendant to the crime. In addition, the defendant contends that the evidence is insufficient to support the defendant's convictions under a theory of criminal responsibility. The State argues that the evidence sufficiently corroborated the defendant's statement that he robbed and murdered the victim and that the evidence adduced at trial supports the jury verdict.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

To be sure "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti." *See State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). The corpus delicti consists of two elements: (1) a certain result has been produced and (2) some person is criminally responsible for the act. *See State*

*v. Shepherd*, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The State needs "only slight evidence of the corpus delicti . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281. Furthermore, when a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951)). "Whether the [S]tate has sufficiently established the *corpus delicti* is primarily a jury question." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). All elements of the corpus delicti may be established by circumstantial evidence. *State v. Garmon*, 972 S.W.2d 706, 708 (Tenn. Crim. App. 1998).

First degree murder, as charged in this case, is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). "Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-403(a).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

With respect to the corpus delicti, we hold that the State met its burden of proof. The discovery of the victim with a fatal wound and the testimony that the cause of death was homicide established the result of death and that someone was criminally responsible. In addition, Mr. Akins testified that the defendant told him that he had "just killed somebody," that he "[done] something at the store on Porter Road," and had even admitted that he was the man seen in the surveillance video attempting to enter the Smoke Depot. Moreover, Special Agent Betts determined that the gun recovered from the defendant's car at his arrest fired the bullet that killed the victim. With respect to the robbery, the testimony of the victim's wife about the cash and other items the victim typically carried on his person, along with Detective Filter's testimony that the victim was discovered without a wallet or any form of identification, established the commission of the especially aggravated robbery. We find this overwhelming evidence more than sufficient to establish

-13-

the "slight evidence of the corpus delicti" required by law. *See Smith*, 24 S.W.3d at 281.

The defendant argues that the version of events relayed in his confession cannot be reconciled with the physical evidence. Specifically, the defendant cites his initial claim that he shot the victim from a distance while running from the scene, as well as his amended version of events, in which he stated that he shot the victim in the top of his head. Because, as the defendant contends, the victim's wound was located above his left ear and the stippling marks indicate that the shot was fired from a distance of six to 24 inches, the evidence belies his confession to the crime. We agree. The jury heard the defendant's statement and clearly rejected his version of the events, as was the jury's prerogative. Questions of witness credibility and all factual issues are resolved by the jury, *see Cabbage*, 571 S.W.2d at 835, and in the instant case, it is clear the jury believed the defendant had robbed and murdered the victim, if not in the exact ways in which he claimed.

Finally, regarding the defendant's claim of insufficient evidence to support a conviction under a theory of criminal responsibility, we find no evidence to support his claim that another person was involved in the crime, aside from his own self-serving statement. The trial court instructed the jury on the law of criminal responsibility, and the jury returned a general verdict of guilty. Thus, even if, as the defendant claims, another person was involved in the robbery and murder of the victim, the evidence adduced at trial supported the jury's verdict.

Viewing this evidence in the light most favorable to the prosecution, we hold the evidence adduced at trial more than sufficiently established that the defendant robbed and murdered the victim and thus is guilty of felony murder and especially aggravated robbery.

*IV. Consecutive Sentencing*

Finally, the defendant challenges the trial court's decision to impose consecutive sentences.

When a defendant is convicted of multiple crimes, the trial court may order the sentence to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

-14-

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

In the instant case, the trial court based its decision to order consecutive sentencing on a finding that the defendant was a dangerous offender, *see* T.C.A. § 40-35-115(b)(4), and made the following findings:

The facts of this case are pretty clear and just from the position of the victim and the way the bullet was, he was practically executed while he – the money or his possessions were out on the hood of the car, so there was really absolutely no reason to take this man's life. And he was executed. There's no – even though the defendant said something about self-defense, there's absolutely no evidence of that at all. And his statement about the other homicide, which was committed with the same weapon, which was just a short time prior to that, would indicate not only is [he] a dangerous offender but the aggregate term must relate to the severity of the offenses. There's two homicides. It's necessary to protect the public from further serious criminal conduct by the defendant. I think the Wilkerson factors apply. Clearly two homicides in a short period of time involving execution-style matters would indicate we need to keep [the defendant] incarcerated as long as possible to protect the public from further serious criminal conduct by the defendant. Therefore it's twenty-five years consecutive to the other sentence.

Under these egregious circumstances, we find no error in the trial court's decision to impose consecutive sentencing.

*V. Conclusion*

The trial court properly denied the defendant's motion to suppress his statement to law enforcement officers and his motion to suppress the evidence seized at the traffic stop. The evidence is sufficient to support the defendant's convictions, and the trial court did not err by imposing consecutive sentences. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE